Okay, good morning, gentlemen. Can you all hear me? Just not? Yes. Okay, fine. Thank you. Thank you for appearing in this unusual situation. We appreciate your indulgence and the fact that you're all connected. Well, hope this hope this continues for the entirety of the argument. I would just remind you that it just the same as if we were in New Orleans, we allow no photos of video or audio recordings of this session. Please mute your telephones if you need to do that so that we won't have interruptions. And finally, I would we would citations, as you argue, because this is a particularly fact intensive case. And with that, I call number 1940718 Garcia versus United States. We'll have first from Mr. Villarreal. Good morning, Judge Jones, Judge Jolly, Judge Willett. Who did you clerk for? I clerked for Reinaldo Garza. Ah, ah, the king. In 98. OK. Well, it's an honor to be here today, judges. This is a really interesting case. This case arises out of the death of Patricia Cervantes as she swam across the Brownsville Ship Channel on the night of April 23rd, 2015. There are five issues in this case. One, did the U.S. Coast Guard owe a duty to Patricia Cervantes? Two, did Patricia Cervantes lack standing to bring a products liability case claim against Safeboats and Mercury Marine? Three, do Safeboats and Mercury Marine have immunity under the contractor's defense? Four, is a wrongful death claim moot? And five, does Patricia have standing to bring a failure to warrant claim against Safeboats and Mercury Marine? I'm going to try to cover at least three of these issues, your honors. I'll start off with foreseeability. Did the U.S. Coast Guard owe a duty to Patricia Cervantes? Consolidated versus C.F. Bean states this court held that duty is determined by the foreseeability of harm suffered by the complaining party. And in Ray Great Lakes, this court states that the lower court must consider the facts and circumstances in order to determine foreseeability. Well, the court in this case that I'm in held that the plaintiff failed to provide any evidence that the injuries to Patricia were foreseeable and that the plaintiff failed to show what duty was owed to her by the U.S. government. Well, there are four documents in the record that show foreseeability. First one is the U.S. Coast Guard's final investigative report. The second one is Brandon Ray's deposition. The third one is Lieutenant Kelly's report and fourth office report with statement. The U.S. Coast Guard report record on appeal 7280 states, quote, migrant and drug smuggling occurs along the length of the Brownsville Ship Channel, most commonly under the cover of darkness at night and in the early morning. On the same page, it states that undocumented immigrants typically use flotation devices, including inner tubes, to assist them to cross the Brownsville Ship Channel. And on record on appeal 7278, it states that it is common knowledge among law enforcement that the Brownsville Ship Channel is a crossing area for undocumented aliens. I took the deposition of Brandon Ray. He's the captain of the boat, the Coxson. And on record on appeal 7278, he admits that he knew that the Brownsville Ship Channel is well known for migrant crossing. Lieutenant Kelly's report record on appeal 7304 states that undocumented aliens activity happens in the Brownsville Ship Channel on a regular basis. And officer Portwood's statement on record on appeal 7309 states that he is leery of driving in the Brownsville Ship Channel at night because of immigrants crossing. He states that anyone over traveling over 10 knots in the Brownsville Ship Channel is a dangerous speed. United States versus Risa Hernandez. This was a case that was that that that went before this in 2018. And it's the underlying criminal case arising out of Patricia's death. There's an opinion. Risa Hernandez, the smuggler argued that it was unforeseeable that Patricia would be hit by a vessel that was negligently operating the Brownsville Ship Channel without lights and at unsafe speed. It was talking about the U.S. Coast Guard vessel. And this court affirmed the lower court sentence. The court held that the risk of harm was foreseeable and it cites to Hall versus Atchison, which is a judge wisdom opinion. Where it says that the precise nature of the resulting injury and the manner of its infliction is immaterial so long as the injury is of a type that is so long as the injury is of that type in the circum excuse me so long as the injury is of a type that in circumstances might reasonably have expected to occur. The plaintiff argues that under Risa Hernandez and Hall Atchison we set aside the fact that Patricia was undocumented and set aside the argument by the U.S. government that she should have been using noise making or illuminating equipment to warn the U.S. the U.S. Coast Guard of her presence in the water. Instead we we simply look at whether striking a swimmer in the Brownsville Ship Channel at night was a foreseeable harm. In fact the fact alone that the mission entailed looking for undocumented aliens crossing the Brownsville Ship Channel is sufficient to give us foreseeability in this case. In support of its ruling in this case the lower court points out that none of the crew members had actually ever seen an illegal alien crossing the Brownsville Ship Channel and therefore that no duty was owed by the U.S. government. In Hall versus Atchison just judge wisdom held that the fact that an actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable. Based on the evidence in the record judges the plaintiff requests that this court reverse the dismissal of the negligence claim against the U.S. the United States and that it rendered that there is foreseeability and that there is a duty owed to Patricia by the U.S. government. Are there any questions from the panel before I jump into issue number two? I know I just have a quick preliminary question about pardon me about standing and can you point me to something in the record that shows that Garcia is in fact Cervantes's spouse under Texas law? Yes your honor. Where is that in the record? That's on I have it here your honor let me see record on appeal 3522 okay and that is a the record shows that on October 5th 2018 a probate judge for the state of Texas has decreed that Francisco Ortega was a lawful spouse of Patricia Cervantes. May I continue to issue number two which is issue number two in this case is that Patricia Cervantes lacked standing to bring a products claim against safe boats and mercury marine. In 1965 restatement second was published but it limited recovery to users and consumers. In 1969 Judge Willett the Texas Supreme Court rejected the limitation and in Darrell versus Ford in 1969 Texas Supreme Court adopted bystander claims. In that case the plaintiff was rear-ended by a vehicle with defective brakes and the court held that the person that was hit had standing to In 1998 restatement third of torts did away with the use of consumer limitation and in 2000 this court in crumble crumble versus bombardier the court cites to restatement third as authority in a case in Admiralty but the bystander claim was not at issue in that case. Watts versus Zapata 1975 circuit state case stands for the proposition that state law applies when the injury was imposed on manufacturers by the state should be recognized in maritime torts when it works no material prejudice in maritime law in just first chambers actually judge wisdom cites to just versus chambers which is a 1941 supreme court opinion which states quote the states can modify or supplement maritime law by creating liability which a court in Admiralty will recognize and enforce as long as it is not hostile to the characteristic features of maritime law or inconsistent with federal legislation by the same token when the common law of a state in whose territorial waters a maritime tort occurs has been modified or supplemented so as to impose on manufacturers or builders a duty of care to persons not in privity a court of Admiralty should recognize that duty and enforce the liability proximately resulting from the breach thereof if adoption of that rule works no material prejudice to maritime law so Staples and Mercury Marine are arguing that the incorporation of the bystander claim under re-statement third would would destroy uniform uniformity in Admiralty because it exposes manufacturers to to a seller to and a seller to a new kind of plaintiff we argue however that one this accident happened in the territorial waters of the state of Texas and Texas has adopted the bystander claim which is not hostile to maritime law two Patricia is a person not in privity with the manufacturer yet has a valid bystander claim under Texas law and under just first chambers and Watts versus Zapata Patricia has standing to bring bystander claims against Staples and Mercury Marine. Mr. Villarreal let me ask you uh uh does is bystander liability not does it uh does it apply whether or not the person the alleged plaintiff was involved in illegal activity uh yes your honor it I believe it does the um in we the bystander claim your honor um I don't know that the court looks at whether there was illegal activity or not your honor yeah well I just was wondering that and the other thing I'm wondering is the district court focused not on restatement third but 402a of restatement second which it bystander cases yes your honor and and and and I figured that's why we you know we we granted oral argument I'm not sure because because if I think the issue here and and would be whether restatement third applies in admiralty cases and does it apply does it extend to bystander claims your honor uh my argument is that the lower court saying restatement second applies and that and that there are no bystander claims but under Cromwell versus Bombardier which was a case in admiralty involved involving a wave runner where a gentleman broke his ankle this court uh cites for I believe for the first time a restatement third which is an indication that it's adopting restatement third your honor and as as I've stated restatement third doesn't weigh with the bystander claim well I'll just point I was on a panel a few years ago in another case where we made it clear in a footnote that we were not adopting um restatement third in in a I thought in a I I think it was it was some kind of maritime claim it was post-Katrina so anyway and again your honor I'm basing my argument on Cromwell versus Bombardier which is well Cromwell yeah I'm looking for the site in your um 206 federal third 548 oh thank you that's all and that in the court adopts uh or cites to restatement third but it doesn't talk about the bystander claim and this case is a little bit different because we're asking for a bystander claim your honor right and so we argue that shielding manufacturers and sellers from bystander claims is not an intended feature of maritime law nor is there any federal legislation intending is shielding from uh shield manufacturers from bystander law and the standard in just versus chambers is not whether it will prejudice the manufacturer but whether it will work in material prejudice to maritime law but even if the court thinks that it might prejudice safe boats uh or mercury marine the plaintiffs still have the burden of approving their case under civil rights excuse me civil practice and remedies code 82.005 so with that said your honors um again the question the real question is will the fifth circuit extend the restatement third to bystander claims i'm under the impression that that the fifth circuit has already adopted in crumble the uh the uh the uh restatement third your honor in the interest of time your honor i'd like to uh to move to uh the third issue do safe boats and mercury marine have immunity under the uh judge jones jolly and willett uh which i'll probably talk about in my rebuttal uh it's two pictures of the vessel and a report by ata uh which is relevant to issue number three by the way you should not bring up in rebuttal any arguments that have not previously been addressed i'll bring it up but now just briefly your honor sometimes in these product liability cases it's hard to to determine uh you know what exactly is the defect the defect that we're alleging here is that you can't see over the bow of this vessel for the majority of the time you can't see over the horizon and this is the vessel that was sold to the united states of america there's also this picture where you can clearly see the bow rise and this is this is the subject of the of the product's liability case and there's an ata report that was published in 2011 uh where a nine-year-old boy was killed by the same vessel a sister vessel in san diego bay and it explains to the court uh what exactly is the defect with this vessel but now the problem the problem that that appears to me that you have is the matter of the fact that it would have planed out at the speed that most of the evidence of the experts indicated at which speed it was traveling and and that's a question of fact your honor for the i believe for the prior facts for the judgment it's really a question of expert testimony and i'm not sure that you had any expert testimony in there other than the possibility that it could have happened in response to one of your questions you produced no experts as i understand it uh that would have testified that the speed was less than 30 your honor the expert that i have is uh expert uh mr martin and dr benda who state that it's right on the cusp right on the cusp of the 35 knots is the required speed before it settles into the water again is that what you're saying he blanked out we can't hear you mr vrl something happened you scared him judge shawley oh he's back okay i'm back i froze judge the the problem is this your honor it's almost like the dynamite with a short fuse you know there's a problem with the bow that doesn't get corrected unless you're going really fast and so the problem is is that you can't see over the bow unless you're speeding and that can't be right so so the issue is that if you're going you have to go so fast to see where you're going it gives you less reaction time your honor so i mean what what does this have to do with the fact that that whether it was planed out or not i mean at what you said that your expert you had qualified experts that testified that it did not reach the level of planing out until it was at 35 knots is that what you're saying yes your honor i have experts saying that that it was right on the cusp and it's and there's a question on whether the the pilot the captain could see over the bow properly or not i i believe there's a genuine issue of factors to that your honor okay and there hasn't and there hasn't been an evidence you're hearing over it and and that's what we're asking for your honor well i mean my impression was that that you had presented no experts that challenged the fact that the vessel itself was going uh 30 knots going at 30 knots per hour and that the the expert testimony indicated at that point or at 30.3 it would have planed out where visibility would have been restored i have an expert your honor in the record uh that says and it's dr benda that says that at that speed it's so close and also uh martin is one of my also there was a problem with the gps system that the government had because it wasn't properly date stamping the uh time stamping the chain of events so at best their calculation of speed is an estimate that they eyeball it because they don't know exactly what the speed was at the time of impact because their gps was not time stamping the uh the the event it was broken so we don't know exactly what speed they were going at this it's just allegations okay you've answered my question and and then there's a contractor's defense but i see that i've run out of time unless the court has a question about the contractor's defense i guess not thank you sir we'll hear next from uh mr fan for the u.s government good morning uh may please record dennis fan on behalf of the united states this tragic collision that resulted in mr van de's death was from the perspective of any ordinary vessel in the brownsville shipping channel without precedence sir van de's attempted to avoid detection while swimming the length of almost two football fields in the middle of the night across a high traffic shipping channel frequented by towing barges and large tankers the coast guard members here had never encountered a swimmer in the water and there's no indication that any vessel had collided with one before the district court properly held that covert night midnight swimmers were not the sort of reasonably foreseeable risk that all vessels in a shipping channel have a duty to accommodate i do want to focus here on what the narrow legal question is which is whether midnight swimmers avoiding detection are in the sort of standard set forth by this court's consolidated aluminum and in ray great lakes case in the general class of persons that might have been anticipated by a reasonably thoughtful person what we have here is an incredibly unusual time midnight an incredibly unusual place a shipping channel an unusual activity in a shipping channel at midnight which is swimming and doing so in a very unusual manner which is attempting to avoid detection i'm all of those judge jones at what point may we begin to yeah i'm happy to take questions whatever it seems to me that there is evidence that witnesses on the boat itself said that it was not unusual to have people illegal immigrants i mean to try to swim the channel at night that though it had never happened to them that it did happen two or three and one said four times a month no i go ahead uh i'm sorry i didn't mean to interrupt you judge i i really do want to commend you um uh opposing counsel pointed out uh officer kelly who's intelligence officer down there in corpus christi if you start on page 7304 of the record what she says is that these individuals are usually encountered on land they're encountered on the vessels that the united states coast guard boards and that is what totals two to four encounters a month across the entirety of a 14 mile stretch the coast guard is not down there it seems to me that if you're out there on the water for the very purpose of determining whether there is any illegal crossing that you would have exercised some judgment knowing that that was a possibility of even a probability so i you know i had sort of two answers to that as well the question is of course not whether there's simply a possibility or if anybody in the coast guard thought there was a possibility of this happening but whether there was a reasonable probability of encountering somebody across a 14 mile stretch who was themselves trying to avoid detection and so i do want to kind of clarify what is going on in this shipping channel which might help because i think that probably not entirely clear when the coast guard is down there along a 14 mile stretch of the shipping channel they're not looking across the width of two football fields to see where in the at some point in the night you know across anywhere in that stretch of water whether they might be you know by an oil tanker by a towing barge or whatnot what they're doing and opposing camp was pointed out our coast guard report if you look at page 72 83 of the record they're looking at the southern shoreline for immigrants because the only way to actually catch somebody is not by staring into the water or to take sort of precautions that involve looking and you know combing through a vast shipping channel is to actually look at some concrete location such as the shoreline um so that's what's going on here they're looking on boats which is how they look at the shoreline why isn't there the possibility even the probability that the people that are standing on the shoreline are going to get into the water and try to cross it so i think this is a problem of plaintiff's own complaint which acknowledges this on page 1004 of the record which has uh this you know cervantes and ruiz hernandez waited to see if there were any patrol boats while on the shoreline and that's what happens they they wait on the shoreline because you can see up and down the shipping channel um and they say well there are no patrol boats coming down that we see and thus we're going to kind of jump into the water at that but that only highlights how unusual this type of situation is the fact that individuals look for patrol boats going down the shipping channel and then at that point decide to jump into the water in the middle of the night that's what makes this an incredibly unusual type of situation and like as i mentioned this is a duty that's owed if there's a duty here it's one that's owed by all private vessels in the shipping channel these are oil tankers these are towing barges they're all manners of private vessels that would need to owe the same duty as the government oh there's no sense that those type of private vessels would take the type of i know i vessels would have the same duty uh in this respect when the vessel that we're talking about here has expressed obligation to be looking for exactly the kind of transaction that happened yeah so again uh you know i i think the the right analogy here is any other type of vessel and that's the suits and admiralty act which is a waiver of the united states's sovereign immunity that it's in it's a liability if a vessel were privately owned or operated and in those same circumstances but the government is here with a mission they do routine patrols they intercept illegal fishing they go after illegal narcotics but that can't be what creates the duty the fact that you know they're doing something beyond what a private vessel would be doing it has to be suppose the border patrol were uh patrolling in an area with in propinquity of the border and they're looking for drug smuggling and alien smuggling in the middle of the night and it's a dark dark uh deserted road although they know it's a high traffic area and uh some people are dressed in black trying to scurry across the road and the border patrol accidentally runs them down that's the same question of foreseeability is it not that i i don't yeah i i think this court would look at land-based analogies it would look at those types of circumstances and i i know my time's expiring even if you give it even if you give uh judge jones's analogy uh credibility which i i certainly do uh it seems to me that you don't speed up on the road when you know that there may be crossings even with people uh disguising themselves in colors that match the night i mean here they they they sped up uh i just want to point out two very small things regarding that they they sped up because there was going to be more lighting around the area that they were entering into and also the second point i was going to mention briefly about the the speeding up point is of course there's no posted speed limit in the shipping channel of course boats in the shipping channel do need to speed up and sometimes the coast guard does need to speed up i don't hear i don't hear the captain of the boat or whomever was in charge of it uh said that the only reason he sped up is because he didn't notice it he didn't think he was going that fast and he slowed it back down i thought that was no they they thought the break um so the there was a toxin on the boat and a break-in toxin the break-in was trying to accrue hours uh driving the boat and they the break-in sought explicit permission from the actual toxin to speed the boat up so it's not that they just accidentally am i in error to say that some witness one of the government witnesses testified that the reason that it sped up to 30 miles an hour was because he had negligently uh overlooked the fact that he was speeding up i i'm not sure which witness you're uh referring to but i think the relevant facts with regard to this are in the coast guard report from pages 70 to 81 to 83 and you'll see there that the break-in toxin sought permission from the toxin to speed up at times patrol boats do need to speed up because these individuals need to gain experience about how this boat operates and how fast they can or can't be going um so that that isn't something that's so unusual and certainly it's not it doesn't defeat any of the unusual aspects of somebody swimming the channel in the middle of the night um and unless this court has further questions we would urge that it affirm the decision of the district court on this all right thank you sir uh next we'll hear from mr maso thank you your honor uh chad maso for the defendant safe boats international llc we we briefed a number of reasons we believe uh the summary judgment on behalf of safe boats and mercury marine ought to be affirmed i plan to focus on a couple of them i'll address questions of course on all i think the most important issues to discuss are number one causation and number one and number two the government contractor defense i'll spend a moment towards the end of course addressing the the spousal standing question i know judge willett had a question about that and then the restatement issue which is an interesting issue but may not be one that actually needs to be answered in this case and i'll welcome questions at any time on any of these issues as for causation and i want to point out briefly this is an issue that the plaintiff did not brief we briefed it in our brief but in their reply they didn't address it so we're kind of shooting from the hip as far as what places in the record the the plaintiff is are not actually of those pictures are not actually of the vessel involved in this case that's a different vessel that took place there was an accident back in 2009 in san diego the report that was referenced dealt with that case that situation and those photographs deal with that incident that those materials are in the record at 7251 to 7274 and of course we don't know what speed that boat was going at at the time what the rpms were a lot of the factors that affect the trim angle which we know is the plaintiff's primary complaint the circumstances in that case were of course different than they are in this case just wanted to make that clarification the theory is to causation that the plaintiffs have asserted is that the essentially that the vessel was just going too fast and the way they try to pin that on the product manufacturer is to say that because of visibility was impaired at lower speeds we had to go at a higher speed and that is simply too far of a stretch to show substantial factor causation which is the standard here as judge jolly pointed out earlier this vessel was going at or around 30 knots the evidence is conclusive on that point there is not a dispute all of the evidence in the record points to this coast guard members that were on the vessel at the time that the boat was going between 30 and 32 knots there was speculation that mr villareal said that he had witnesses that testified that it was at about 30 to 35 knots at the time is that correct or that it would take every 35 knots to for it to level out is that correct uh to level out no your honor the the expert analysis was that and this was not contested either the boat achieves planing at around 20 knots at that point visibility begins to improve and the the consensus of all of the experts is that visibility is good on this vessel up to around eight knots at which points it begins to diminish it reaches plane at 20 knots and by about 30 knots visibility is good again so there's a range in the center of what we know what there is absolutely no dispute about in this case is that at the speed this vessel was traveling at the time of the accident there was no impairment to visibility so it doesn't matter whether we were going 30 knots or 40 knots or even 50 knots which would have been the upper upper end of the range of this vessel it could have been going a lot faster and whether that's wise to do that in the commercial shipping channel is an issue not for our parties but the fact that we were going 30 knots means that visibility concerns at lower speeds simply do not matter we know that the break-in coxswain the individual driving the boat was in training perhaps that's why he was wanting to go faster but are you telling me that it is absolutely indisputable uh in this record that uh you'll go that the vessel was traveling more at 30 or more knots per hour there is no evidence to the contrary okay none no evidence was presented to the contrary if the defect in this case the alleged effect in this case is that visibility is diminished between eight knots and about 30 knots this vessel if we lost mr villarreal he's not on my screen i don't know yes your honor he's having internet problems so we're not he's not he's not with us now is that correct no he's not with us now i'm waiting for him to rejoin should i continue or wait just wait thank you for noticing it there he is i had perfect internet for months and this is unbelievable i apologize judges it's okay i i missed most of the uh argument but i'll be happy to rebut i think i know what the points might be if the judges want me to touch up is it is it my turn to rebut no no we we stopped oh judge jolly you've been asking questions favorable to you and uh basically and mr maso can correct me but uh uh what the big point of uh dispute was whether there is no dispute that the vessel was going 30 knots at the time of the accident okay so if we take up again what your answer mr my answer your honor was that there is no contrary evidence all of the evidence that we have says that the vessel was going between 30 and 32 knots okay and just to wrap up that part of the causation argument our position is that if the alleged defect in the vessel which is that trim angle that impairs visibility if that alleged effect has no effect at the speed the vessel was traveling then it cannot have been a substantial factor in this accident briefly with regard to the propeller guards which was the other complaint that the plaintiff has about the about the vessel the consensus of all the experts again and this is including from plaintiff's own expert is that at this speed propeller guards would not have made a difference at that speed it would have been a traumatic injury and plaintiff would have died almost that challenges that testimony there is not your honor finally the uh the the argument is that the injuries would have been less so but does that just mean that she would have drowned later than she did with the more severe injuries the the testimony from from mr benda who is the plaintiff's expert said that if the vessel had been going slower propeller guards would have made the injuries less severe but at this speed they would have been traumatic and fatal all the same it would not have made a difference in the end that was his testimony that was plaintiff's expert's testimony that death would have been as instantaneous uh as as it was at that speed i don't remember without guards i don't recall the exact verbiage that he used but my impression was that it would have been an immediate traumatic fatal injury all the same just because of the speed at 30 knots you're getting hit by the keel of the boat perhaps even before the propellers all of that would have been fatal at 30 knots whether the propellers had a cage over them or otherwise finally we don't believe a warning there was no evidence that a warning would have made any difference for the simple reason that the coast guard was well aware of the risks i'll address briefly the government contractor defense the coast guard requested and was provided a high speed planning vessel this is what they asked for this is what they were provided we discussed several cases that talk about the approval of precise or reasonably precise specifications which i think is probably the stout case which i think is a great one in our brief there are also a couple of others the kerstetter case that deals with a pilot restraint system these are ones the stout case and kerstetter both are fifth circuit cases that involved safety features that could have conceivably been included in a design what is the specificity that you rely on here uh or the contractor immunity the the specificity is the overall design of the boat the that was provided to the government and evaluated by the technical evaluation team over a series of government did not design the boat you designed the boat that's correct the the government aspect of the design of the boat was done by the manufacturer by you your client uh i i believe that's accurate and as i also understand that if just simply by asking for a plane a plane in vessel that there were other designs that that uh at least three designs that you uh that would have been available uh to design by which to design the boat that's correct so just asking for a plane in vessel is not specific enough to require the contractor to kick in the contract immunity defense would that be fair that alone it would not be sufficient that's right your honor the difference we have in this case and what makes this very much akin to stout and kerstetter and also the heart of l versus general dynamics case out of the 11th circuit is that we as the manufacturer and designer provided the detailed specifications of our proposed vessel to the coast guard which conducted a in-depth extensive evaluation of those specifications and decided to adopt them not only did they decide to deprove them but they decided to approve them not withstanding the absence of safety features that the plaintiff alleges might have mitigated this accident in kerstetter that was an additional strap and the pilot seat that was omitted the this court found that the government contractor defense applies in heart of l it was electrical wires that hadn't been wrapped or secured sufficiently to prevent chafing the 11th circuit in that case said yes that could have been done you could have added that safety feature but the government approved this the defect that you're complaining of was actually inherent in the system that the government approved and in this case the defect that the plaintiff is complaining of is inherent in a high-speed planning vessel the coast guard wanted a robust high-speed planning vessel and that's what we provided they the government approved the details of the specification including the absence of the safety features that usually my impression on reading these cases over the years is just approval is not uh sufficient as a basis to decide to claim the community defense is it it can't be a rubber stamp it has to be a serious review um and and there were cases that the the plaintiff discusses in itchbury i think trivino where it was a very high level yeah that's fine kind of approval and that's certainly not enough we go beyond what a lot of the cases call for the technical evaluation team in this case spent a significant amount of time was actually sequestered in reviewing all the details a a high level team of analysts engineers architects stakeholders the users captains all of these people conducting an extensive review of the specific details of this design and said this is good we adopt and approve these detailed specifications for the design of this vessel and in just like the cases i was just discussing that approval is enough just very briefly on the spousal standing issue just i'm sorry judge willett had a question there was a probate determination of of airship but we discussed this it's not addressed in our brief here but in the district court briefing at 3761 the law is that a probate determination probate determination is not binding on the determination of rights for a survival or wrongful death claim so the simple fact that there was a probate determination of airship does not matter for purposes of a wrongful death or survival case but even if garcia liked standing to bring any claims as a spouse or a successor he could still maintain claims as next friend of his and mr vantes's child correct that's correct just wanted to make that clarification okay um mr vio now back back to you thank you judge i hope my internet works i apologize again um i'd like to address uh what mr maso said that he specifically said to this panel that that the vehicle that this vessel was traveling somewhere between 30 and 32 knots the report that you have in front of you the ata report is crucial it's a sister ship it's identical to the one that that caused this accident and in the conclusion it says that on the last page that that this vessel has a defect anywhere from 8.2 knots to 30.3 knots so if the vessel was going 30 knots as mr maso says it would have fallen within that defect to judge jolly and i know that you were you were asking about whether it was a genuine issue material fact as to speed there is for the simple reason that the time stamp was not working and as and mr maso cannot say with specific specifically at what speed it was traveling and that's why it needs it the court should be able to hear that and have an evidentiary hearing the other point is on the contractor's defense safe boats wants you to believe that that they follow the the stout opinion that they reviewed evaluated tested and approved this vessel none of that is is is reflected on the record in fact the um i took the deposition of uh of aaron hakes the design manager for safe boats can you all hear me okay yes sir okay and he says that the design hole is proprietary proprietary to safe boats and considered a trade secret um the center of gravity is determined by safe boats engineers the running trim is determined by safe boats engineers and and the design of the design of the hall again is proprietary that's on record on appeal one nine nine nine three six five three and seven two four four i took the deposition of mr shepherd record on appeal five four seven four and and you can tell here that the government you know does not participate in the design because he states that when it comes to design performance the u.s coast guard does not get involved because they don't want to accept responsibility for the performance of the vessel in case anything goes wrong and uh and again miss miss jennifer peterson who i deposed record on appeal 3630 uh states that the parameters the final length width and these weight of the vessel is determined by the manufacturer so the safe folks wants you to believe that they that they that the government participated in this design and it didn't all it did was it it put together the request for quotation but it wasn't it wasn't specific enough to meet the the boil test and again because it's a it's a trade secret uh safe folks had the ultimate decision on this design of the vessel and the design of the hull is what affects the bow rice and and we can hear you can you all hear me okay yes sir okay you're out of technically you're out of time but if you have a few words uh you know anything you need to cover go ahead the other thing thank you judge it just to address uh mr fan there is no speed limit because you're supposed to travel at a at a appropriate speed given the circumstances and and you were correct in stating that uh that uh that he was traveling at an unsaved speed and it's important to note that the coxswain was decertified he was punished he was reprimanded for going at that speed and there was no reason for him to be going that speed two miles from the and and and clearly they're looking for illegal aliens in the brownfield ship channel so it is foreseeable and they should have they should have watched their speed is there anything you know i was on the panel that affirmed the conviction of the coyote here yes and as i recall it and i could be wrong and maybe you can correct me it was very unusual for this coyote to put this woman who could bear apparently barely swim in a little plastic kid's inner tube and and start her uh you know kicking across the ship channel at this is there anything in this record about how unusual that was or am i misremembering uh in the in the record notes being that it's unusual no it's i think the the standard for foreseeability is is it foreseeable that that there's going to be illegal lately and swimming across the brownsville ship channel and and and in this case of course flotation devices and so forth raises the issue of foreseeability separate and apart from the fact whether she knew how to swim or not uh whether she was under the cover of darkness it was very probable and it was foreseeable foreseeable that there would be swimmers because at the end of the day that's what they were doing they were looking for illegal aliens how can they say it was not foreseeable that they could actually hit somebody and reese and reese uh hernandez you all quoted to uh to hall versus atchison and and you said that that the fact that that the boat may have been feeding that the boat may have been breaking the law was immaterial and therefore my argument is is that the fact that that she was undocumented and under the cover of darkness is also immaterial in this stretch of water it is it there's a strong likelihood you're going to hit and you know you're going to come across a swimmer if she'd been swimming across the mississippi it'd be a different argument nobody swims across the mississippi but in in brownsville illegal aliens swim across the brownsville ship channel on a regular basis and you have where's your evidence for that just in these things that you've already cited yes your honor i've got the u.s coast guard's final report the mission if okay does it distinguish between swimming and going in raft yes it says that it also says that undocumented immigrants typically use flotation devices including inner tubes to assist them she was what they found that day was a pink inner tube i know it was a little kid's pink inner tube that they had bought at some kind of you know essentially a 7-eleven on the way to the uh to the uh uh departure point so it's it is foreseeable judge that they're going to come across these energy they know how to swim not they use these inner tubes and the government nobody used these inner tubes and in fact they found an inner tube and again the court should not even uh probably not even consider that because uh because of the uh the standards set forth in uh but you know in that in that opinion in the recent opinion okay well um i think we have all the arguments now and um thank you for your time and we'll take the case with great interest thank you judges thank you thank you your honors